**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA WEST PALM BEACH DIVISION**

JEFF BUONGIORNO

        Plaintiff,

    vs.

ALEJANDRO MAYORKAS, in his official
capacity as the Secretary of United States
Homeland Security, et al.,

        Defendants.

_____/

Case No. 9:24-cv- 80920-AMC

FILED BY _____ D.C.

NOV 14 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## PLAINTIFF'S EMERGENCY MOTION TO RECONSIDER ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND FOR EMERGENCY DECLARATORY RELIEF

Plaintiff, Jeff Buongiorno, pro se litigant and pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), submits this Emergency Motion to Reconsider Order Granting Defendant's Motion to Dismiss and for Emergency Declaratory Relief and, in support, states:

## INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), Plaintiff Jeff Buongiorno respectfully moves this Court to reconsider its order granting Defendants' Motion to Dismiss. Newly discovered evidence from the November 5, 2024, general election reveals statistically improbable vote-by-mail discrepancies, vote-by-mail fraud, cybersecurity vulnerabilities, and procedural modifications that compromised the integrity of the election process, and directly impacted Plaintiff's electoral rights. Given the urgent nature of these concerns, Plaintiff also seeks emergency declaratory relief to prevent ongoing and irreparable harm to the integrity of election administration in Palm Beach County.

## GROUNDS FOR RELIEF

1.     Under Rule 59(e), a court may alter or amend a judgment to address new evidence or clear error. Rule 60(b) provides for relief from a judgment based on newly discovered evidence (60(b)(2)) or any extraordinary circumstances justifying relief (60(b)(6)). *Gonzalez v. Crosby*, 545 U.S. 524 (2005) established that Rule 60(b)(6) applies only in "extraordinary circumstances" that justify relief, such as when significant evidence or circumstances arise outside the 28-day period, warranting equitable reconsideration.

2.     Similarly, *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) emphasized that Rule 60(b)(6) may be invoked to prevent procedural limitations from obstructing justice, allowing for relief where strict adherence to deadlines would result in manifest injustice.

3.     Here, the newly discovered data and rule changes were revealed after the initial judgment, constituting extraordinary circumstances that merit relief under Rule 60(b)(6). Without reconsideration, there is a high risk of manifest injustice to Plaintiff and the public, underscoring the need for equitable intervention by this Court.

4.     Plaintiff alleges that there is a massive fraud conspiracy, (ECF-42 PP 73-75) the evidence provided herewith confirms these allegations.

## NEWLY DISCOVERED EVIDENCE

### I - Vote-By-Mail Irregularities, Breakdown in Vote-By-Mail System Internal Controls, and Massive Vote-By-Mail Fraud.

5.     In 2021, the passage of SB 90 updated Florida Statute §101.62, and required any voter requesting a vote-by-mail ballot to provide another identifier to verify the authenticity of

the voter's request. All requests for a vote-by-mail ballot, regardless of the method, are to include a Florida driver license number, Florida identification card number or last 4 digits of the voter's social security number.

6.     In the County of Palm Beach, as of November 5, 2024, the number of vote-by-mail ballot requests made that did not provide identification as is required per Fla. Stat. §101.62 was 19,949. This is indicated in the Vote-by-Mail (VBM) report as of November 5, 2024, which shows in the columns titled "FLDL/StateID" and "VoterSSN4", a designator of "N" in both columns, which is defined by DS-DE-145 as "information was **NOT** provided". See **Exhibit A**.

7.     DS-DE 145 Vote-by-Mail Ballot Request Information File Layout states the only two designators that can be documented in those fields are "Y" which is defined as "information was provided" or "N" which is defined as "information was not provided". See **Exhibit B**.

8.     Of those VBM ballot requests which had "N" as a designation for the "FLDL/StateID" and "VoterSSN4" column, 13,973 had the designator for those columns fraudulently altered to "Y" and "Y" for the "FLDL/StateID" and "VoterSSN4". This is in violation of Fla.Stat. § 104.051 and punishable as provided in Fla.Stat. §§ 775.082, 775.083, or 775.084. See **Exhibit C.**

9.     Defendant Wendy Link has stated that the "N" and "N" designators for the "FLDL/StateID" and "VoterSSN4" means "null". This is false and was intentionally stated to distract from the fraudulent VBM ballots that were illegally requested and issued. By stating this information, the defendant is in violation of Fla. Stat. § 104.051 and punishable as provided in Fla. Stat. §§ 775.082, 775.083, or 775.084. See email **Exhibit M**.

10.     Defendant has also stated that if a voter uses the website to request a VBM and you use BOTH your driver's license and your SSN as forms of ID, the system checks one and

then doesn't know what to do with the second form of ID, so it shows up as "null". See email **Exhibit M.**

11.     This is an intentionally false statement because the minimum number of Vote-by-Mail ballot requests made where there would be no other way to make a request other than through the website, would be on a weekend, we see that 8,258 requests were made with BOTH the "FLDL/StateID" and "VoterSSN4" sections designated with the **"Y"**. See **Exhibit M.**

12.     It is **VERY** important to note that the entire vote-by-mail system is compromised because the requirement to provide identification when requesting a vote-by-mail ballot is the first and only level of internal control to prevent unauthorized access and fraud. Because there was a complete breakdown in the critical internal control that prevents fraud, tens of thousands of unauthorized vote-by-mail ballots were illegally requested and issued. This is clearly indicated by the very report provided by the Division of Elections which shows all the vote-by-mail ballots requested, and whether those requests had provided the statutory required identification for issuance.

13.     The breakdown of internal controls which prevent fraud creates an environment which not only invites but encourages rampant fraudulent behavior by all those who wish to perpetuate this fraudulent behavior. No vote-by-mail ballot issued on a day in which there was a breakdown in internal controls can be considered valid because the protection against fraud was not present. This amounts to a total of approximately 291,787 compromised vote-by-mail ballots, of which approximately 230,465 were voted on. This not only had a material impact on the election results but were in fact THE determining factor of the election.

14.     This vote-by-mail fraud is further exemplified in the following statistical impossibilities.

15.     Plaintiff received 168,416 early in-person votes, while Defendant Link received 160,730 early in-person votes. On election day, Plaintiff received 81,015 votes, compared to Defendant Link's 81,030, totaling 249,431 in-person votes for Plaintiff and 241,760 in-person votes for Defendant Link. This resulted in a margin of victory for Plaintiff of 7,671 votes, or approximately 3.07%, based on in-person voting.

16.     In stark contrast, Defendant Link received 169,300 vote-by-mail ballots, while Plaintiff received only 59,053, yielding a vote-by-mail margin of 110,247 votes for Defendant Link, equating to a 65.12% advantage.

17.     Additionally, Vice President Kamala Harris received 156,242 mail-in votes— 13,058 fewer than Defendant Link, who received more mail-in votes than the Vice President despite being a down-ballot candidate.

18.     Overall, Defendant Link received a total of 411,060 votes, surpassing Vice President Harris's 372,230 votes by 38,830 votes, a margin of approximately 10.43%.

<u>II - DS-DE 40 Form Modifications</u>

19.     Under the supervision of Defendants Cord Byrd and Maria Matthews, on February 13, 2024, the Division of Elections implemented a final change in Form DS-DE 40, which removed two essential columns: (1) Blank Ballots and (2) Duplicated Ballots. See modified form DS-DE 40, **Exhibit E**.

20.     These columns represent vital records in the electoral process. Without these columns the required audit of records to determine duplicate and blank ballots, two historically known threat vectors in the electoral process, cannot be conducted. This change in form DS-DE 40 is an intentional act to masquerade transparency and invite fraudulent behavior.

<u>III. - August 9, 2024, Canvassing Board Rule Change.</u>

21.     On August 9, 2024, the Palm Beach County Canvassing Board passed a rule change that effectively altered the handling and reporting of blank ballots, obscuring transparency in the election reporting process. According to official minutes, former Defendant Bristow motioned, and Defendant Link seconded, the following decision:

"The Canvassing Board discussed the newly adopted Rule 1S-2.027 to include DS-DE 420 Standards for Determining Voter Intent. The Voter Intent Addendum was reviewed and agreed upon for the 2024 Primary Election. The Canvassing Board will utilize the DS-DE 420 and the Voter Intent Addendum for guidance, with particular attention to consistency on ballot markings. Judge Bristow motioned that true under-voted ballots with no markings (stray or otherwise) throughout the ballot will be presented to the Canvassing Board to confirm that it is a truly blank ballot before SOE Staff processes it. Ballots with any markings will be presented to the Canvassing Board for review. Supervisor Link seconded the motion, and the motion passed unanimously."

22.     The recent rule change in 1S-2.027 initiated by the Palm Beach County Canvassing Board accommodates the modifications by eliminating blank ballot reporting.

23.     The Palm Beach Canvassing Board justified replacing form DS-DE 40 with DS-DE 420 by stating this change was to refine "voter intent" determinations.

24.     This procedural alteration disrupts established practices for tracking blank and duplicated ballots, reduces oversight, and creates a gap in critical data reporting. Given the importance of these columns in identifying any irregularities and processing issues, these modifications compromise transparency, election integrity, election accountability, and invites fraudulent behavior.

25.     Judicial review is necessary to evaluate these changes in light of state transparency requirements and to ensure that essential data on blank and duplicated ballots is not concealed from public scrutiny or post-election audits.

26. An example that indicates the necessity of the two columns removed from form DS-DE 40 was when Palm Beach County reported 20,313 blank ballots in the 2020 General Election, a figure relevant to understanding past voting patterns.

27. Without these columns, historic blank ballot trends can no longer be identified and audited to ensure accurate, fair, honest and transparent elections.

28. When members of the public have raised concerns about these rule changes at public meetings, they have been silenced or removed, obstructing their right to oversight.

29. This change in rule violates Article I, Section 24 of the Florida Constitution, which ensures public access to government meetings and records, and safeguards transparency in government procedures.

30. By modifying blank ballot reporting procedures and restricting public participation in discussions, the Canvassing Board's actions call into question the constitutionality of these changes under Florida's public records and meeting laws.

IV - Defendant Wendy Link's Failure to Properly Respond to Public Records Requests

31. Plaintiffs have submitted multiple public records requests to Defendant Link seeking critical information relevant to the oversight and conduct of the 2024 election. Defendant Link has either failed to respond adequately or has closed requests with the response, "There are no responsive documents to your request." Plaintiff has noted similar requests have been historically answered by Palm Beach County, and providing the very reports and documents now claim to be nonexistent.

32. This pattern of non-responsiveness and contradictory responses violates all statutory requirements of the public records process and obstructs the administration required by the Florida's Public Records Act.

33. Plaintiffs contend that these violations regarding the procedures of public records requests pertinent to election administration and voter information, raises serious concerns about misconduct and maladministration by Defendant Link, warranting judicial intervention.

34. The following Public Records Requests (PRR) are examples of a "There Are No Documents Responsive" reply:

a. PRR #24-1257, see **Exhibit F**.

b. PRR # 24-1258, see **Exhibit G**

c. PRR # 24-1259, see **Exhibit H**

d. PRR # 24-472, See **Exhibit I** - The original response to Public Records Request 23-92 reportedly contained a valid hash or unique identifier to ensure data integrity. However, subsequent reports related to this request had the hash or unique identifier removed and the date altered to September 13, 1984, which Plaintiffs allege is a fictitious and misleading date. Plaintiffs argue that the manipulation of official public records constitutes misconduct by officials and a violation of Florida's Public Records Act, undermining transparency and public trust in the election process.

Defendants have preposterously contended that the illegitimate date returned in response to the public records request was due to a "battery failure" on the computer that printed the report. Plaintiffs assert that this explanation is implausible and that the cited "battery failure" is an impossibility. To verify this claim, Plaintiffs filed a public records request on October 8, 2024, seeking work orders, purchase orders, electronic communications, or any proof of a battery replacement related to the alleged issue. Defendants have failed to respond to this request. Plaintiffs contend that when public officials ignore valid public records requests, they are guilty of, at minimum, maladministration.

e.     PRR # 24-961, See **Exhibit J**

f.     PRR # 24-983, See **Exhibit K**

g.     PRR # 24-1120, See **Exhibit L** -

35.     Defendant Link has either withheld documents or provided incomplete responses, depriving Plaintiff and the public of our statutory and constitutional protected rights in election operations.

36.     Requests for records relating to the removed columns from form DS-DE 40 (which previously included "Blank Ballots" and "Duplicated Ballots") were not adequately addressed, leaving unresolved questions about election data integrity and procedural irregularities.

37.     This failure to respond transparently to public records requests violates Florida's public records laws and further undermines confidence in the integrity of the election administration.

### V - Additional Evidence of Fraud and Maladministration

38.     Summary of Findings of Petition Fraud (October 11, 2024 OECS Interim Report) The Office of Election Crimes and Security (OECS) conducted an extensive investigation into the handling of Initiative Petition 23-07 related to the "Amendment to Limit Government Interference with Abortion." The findings indicate a substantial pattern of fraud and illegal practices by circulators associated with Floridians Protecting Freedom, Inc. (FPF), who were responsible for gathering signatures in support of this initiative.

39.     The OECS report highlights widespread fraud involving forged signatures, use of deceased individuals' identities, bulk identity theft, and compensation schemes that violate Florida law. The investigation uncovered fraud across numerous counties, with validated

fraudulent petitions approximately numbering in the thousands, and a state-wide average invalidity rate of approximately 25.4% for petitions reviewed from known or suspected fraudsters.[1]

40.　　**Specific fraudulent activities:**

a.　　Identity Theft and Forged Signatures. OECS discovered extensive use of electors' personal identifying information without their consent. Over 20 deceased individuals were used in submitting petitions, and personal data was copied from databases to forge signatures on hundreds of petitions.

b.　　Per-Signature Compensation Schemes despite legal prohibitions. Evidence showed circulators were compensated on a per-signature basis, an illegal practice in Florida. Some circulators were paid up to $10 per signature, incentivizing rapid and unchecked fraud.

c.　　**Systematic Submission of Fraudulent Petitions**. Multiple circulators with high rates of invalid signatures, including some with over **35% invalidity rates**, submitted thousands of petitions. Investigators uncovered evidence of circulators frequently forging names or using fake signatures en masse.

d.　　**Inadequate Oversight and Compliance Failures.** The OECS found that the initiative's sponsors and their subcontractors, especially PCI Consultants, Inc., failed to adhere to Florida's laws and obstructed investigative efforts, leading to a breakdown in signature verification and compliance standards across many counties.

---

[1] files.floridados.gov/media/708442/oecs-interim-report-10-11-2024.pdf

41.     Statistical Improbabilities and Alleged Misconduct. The fraud findings show a 36.6% invalidity rate in Palm Beach County and 32.3% in Orange County for petitions submitted by suspected fraudsters. These fraud rates raise significant concerns regarding the integrity of the verification and approval process.

42.     Plaintiff contends that these findings reflect systemic failures that risk compromising the election's integrity and disenfranchising lawful voters. The Plaintiff seeks an order to halt certification and a mandate for a comprehensive forensic audit of all voter records associated with FPF's Initiative Petition 23-07 and any other petitions with similar patterns of fraud. The Plaintiff argues that failure to address these discrepancies allows for fraudulent manipulation within the electoral process, thus violating voter rights and breaching statutory election integrity.

VI: Repeated Outages by VR Systems on Targeted Days and New Evidence of Foreign Actors Targeting Down Ballots

43.     Plaintiff's Warning of Iranian-Origin Ransomware in VR Systems Infrastructure: On October 17, 2024, Plaintiff alerted Defendant Wendy Link to an active cybersecurity threat within VR Systems, specifying the presence of ransomware from an Iranian Advanced Persistent Threat (APT) group. Plaintiff's detailed threat intelligence highlighted an immediate risk to system integrity and voter data security, particularly in down-ballot races. Despite the urgent nature of this warning, Defendant Link failed to investigate or address the identified threat. See email in **Exhibit N.**

44.     **Microsoft Threat Analysis Center's (MTAC) Confirmation of Foreign Cyber Threats**: Days after Plaintiff's warning, the **Microsoft Threat Analysis Center (MTAC)** released a report on **October 23, 2024**, confirming that Iranian actors, along with operatives

from Russia and China, were engaged in cyber activities aimed at disrupting U.S. election infrastructure. This report further substantiated Plaintiff's concerns by identifying coordinated influence campaigns targeting down-ballot races across U.S. election systems, underscoring the significant security risks posed by foreign actors during critical election periods. See **Exhibit O.**

45.     **VR Systems Outages on Critical Election Days**: Following Plaintiff's warning, VR Systems experienced a significant outage on the **first day of early voting, October 18, 2024,** impacting **Electronic Voter Identification (EVID)** poll books used to verify voter eligibility across Florida. This outage disrupted access to voting infrastructure across multiple counties, at a critical time for down-ballot races, where local election security is paramount. The **Tampa Bay Times** reported extensively on this outage, emphasizing the critical nature of these disruptions on election day operations and the potential impacts on election results for down-ballot races. See **Exhibit P**

46.     **Pattern of Cyber Intrusion and Cover-Up**: The timing and nature of these outages align with the **Election Night Reporting (ENR) outage** seen previously, which also exhibited signs of system delays and potential tampering just prior to deployment. This pattern suggests a deliberate exploitation of system vulnerabilities, targeted specifically at down-ballot races where security gaps are often more pronounced, and monitoring is reduced. Plaintiff contends that these incidents, together with the lack of immediate action following known threats, constitute an intentional cover-up and a systemic failure to protect down-ballot election integrity.

47.     **Negligence Despite Known History of VR Systems Breaches**: VR Systems' known vulnerabilities, including a breach by Russian actors in 2016, have been acknowledged by the **Leon County Supervisor of Elections**. Given this history, Defendant Link had a clear duty of care to rigorously

scrutinize cybersecurity risks. Her disregard for Plaintiff's warning about imminent threats targeting down-ballot races, despite VR Systems' prior breaches, illustrates gross negligence and a failure to fulfill her statutory duty to safeguard election integrity.

48.     **CISA Report Confirms Widespread Vulnerabilities**: CISA's **October 2024 Cyber Risk Summary Report** identified severe, unaddressed vulnerabilities across U.S. election infrastructure. Notably:

- **48% of entities** had at least one critical or high-risk vulnerability.
- **34% of entities** operated outdated systems.
- **39% of entities** maintained risky services susceptible to attacks.
- **76%** were vulnerable to phishing, a common foreign influence tactic.
- **103.7 days average** delay in remediating vulnerabilities.

This report further demonstrates the inability of federal agencies to adequately protect election infrastructure, exposing local races to prolonged risk of foreign interference. See **Exhibit Q.**

49.     **Systemic Federal Oversight Deficiencies**. The October 18 outage is part of a broader pattern of VR Systems' cybersecurity issues as documented in prior incidents, and federal cybersecurity reports. Despite this, Defendant Link abandoned her responsibility to address the issues to federal agencies such as the Cybersecurity and Infrastructure Security Agency (CISA) and the Department of Homeland Security (DHS).

50.     Pattern of delayed reporting and suspected Electronic Voter Identification (EVID) Systems outage coincides with previous incidents of delayed Election Night Reporting (ENR), where system downtimes and reporting discrepancies appeared just before systems went live. This pattern indicates injection of compromised data or manipulation efforts, exacerbated by a

lack of sufficient cybersecurity protocols and response. Such practices diminish transparency and accountability in vote reporting, impacting the integrity of election outcomes.

51.     In addition, to further support the downed ballot skullduggery, a local organization known as Lincoln-Reagan Organization was masquerading as a sanctioned local Republican Club, acted as the conduit for the bad actors who targeted down ballot races and amendments, published and distributed fictitious Republican pick lists containing prominent Democrats such as Wendy Link and Ric Bradshaw. This was a perpetuation of the ongoing fraud.

### VII – Evidence of Mail Ballot Theft

52.     On October 15, 2024, a police report was filed regarding the theft of mail ballots, recorded under Case Number 24-014629. The incident involved theft from USPS mail facilities in an area heavily targeted by Plaintiff's campaign efforts. See **Exhibit R.**

53.     Plaintiff's campaign had actively canvassed this region, knocking on thousands of doors between October 7-11 and conducting a telemarketing outreach to encourage voting by mail among residents. Many of these voters would have mailed their ballots within this timeframe, potentially placing them among those affected by the theft.

54.     This theft not only undermines the integrity of the voting process but also directly impacts the efforts and resources invested by Plaintiff's campaign in mobilizing voter participation. The timing and location of the theft raises significant concerns about the security of mail-in ballots.

### VIII –Discernible Negligence

55.     Defendant Byrd had the opportunity to cure invalid voters. In an email forwarded under the subject "Florida Election Law Violations – Breach of Public Trust," Plaintiff outlines specific violations of Florida election law and describes failures by Defendant Cord Byrd, Florida Secretary of State, to address known election integrity concerns.

56.     The communication emphasizes that Defendant Byrd was informed of issues related to voter eligibility and had the capacity to act on this information. Despite this, Defendant Byrd reportedly failed to take corrective measures to verify and potentially remove invalid voters from the voter rolls. See **Exhibit S.**

57.     This inaction constitutes a missed opportunity to "cure" the voting process and protect the integrity of the election. Plaintiff asserts that Defendant Byrd's neglect in this regard undermines public trust and further justifies a judicial review of the vote-by-mail ballots and election results. This new evidence reinforces Plaintiff's concerns about the systemic issues affecting vote integrity, highlighting Defendant Byrd's role and failure to take timely action to ensure the accuracy and legitimacy of the voter database.

58.     The failure of Byrd and Link to properly verify U.S. citizenship opened the door for synthetic identities to infiltrate the system. A reasonable person in their position would have implemented alternative methods to ensure accurate verification of U.S. citizenship. For example, the Clerk of Courts maintains a Master Juror Pool database of eligible citizens, whose qualifications align with those required of verified electors.

## TRACEABLE DUTIES OF DEFENDANTS

**Defendant Wendy Sartory Link – Supervisor of Elections,** Defendant Link, as Supervisor of Elections for Palm Beach County, holds specific statutory responsibilities regarding election security, transparency, and accurate reporting. These include:

a.    **Florida Statutes § 101.015 – Standards for Voting Systems**: Mandates secure voting systems to prevent unauthorized access or tampering.

b.    **Florida Statutes § 282.318 – Cybersecurity**: Requires election offices to follow state cybersecurity protocols, protecting voter data and network infrastructure.

c.    **Florida Statutes § 282.318 – Cybersecurity**: Requires election offices to follow state cybersecurity protocols, protecting voter data and network infrastructure.

d.    **Florida Statutes § 282.318 – Cybersecurity**: Requires election offices to follow state cybersecurity protocols, protecting voter data and network infrastructure.

e.    **Florida Statutes § 282.318 – Cybersecurity**: Requires election offices to follow state cybersecurity protocols, protecting voter data and network infrastructure.

**Defendant Cord Byrd – Secretary of State of Florida,** Secretary of State and Chief Elections Officer, oversees statewide election security, compliance, and integrity. His responsibilities include:

a.    **Florida Statutes § 97.012 – Chief Election Officer**: Assigns primary responsibility for overseeing statewide election security and administering regulations.

b.    **Florida Statutes § 97.052 – Voter Registration System Oversight**: Mandates oversight of the voter registration system, requiring cybersecurity protocols.

c.    **Florida Statutes § 106.22 – Election Violations and Investigations**: Authorizes investigations into cybersecurity breaches or any acts compromising election security.

**Defendant Maria Matthews – Director of the Division of Elections**, must ensure uniform compliance with election security and voter registration laws, including:

a.    **Florida Statutes § 97.012 – Oversight of Election Systems**: Requires collaboration with the Secretary of State to standardize cybersecurity practices across Florida counties.

b.      **Florida Statutes § 98.015** – Coordination with Supervisors: Supports County supervisors in maintaining compliance with election security and transparency requirements.

c.      **Rule 1S-2.015** – Minimum Security Procedures: Mandates oversight to ensure that county supervisors implement necessary security protocols.

**Defendant Ashley Moody – Attorney General of Florida,** has statutory responsibilities related to upholding the integrity of state elections and ensuring that legal standards are maintained across election processes to include:

a.      **Florida Statutes § 16.01**: As the chief legal officer of Florida, the Attorney General has a duty to enforce the law and address election-related violations.

b.      **Florida Statutes § 104.091**: Grants the Attorney General authority to investigate and prosecute any violation related to election fraud and irregularities, ensuring that election processes maintain public trust.

c.      **Florida Statutes § 97.012(15)**: Directs the Attorney General to coordinate with the Department of State to address any legal matters affecting elections.

d.      **Florida Statutes § 501.204**: Imposes a duty on the Attorney General to address any deceptive practices, which may include investigating and prosecuting deceptive practices related to election procedures, ballot handling, and vote reporting.

**Plaintiff asserts that Defendant Moody's statutory obligations include ensuring that any actions affecting election transparency and security are thoroughly scrutinized and compliant with state law. Her failure to address procedural discrepancies and cybersecurity concerns raised here further justifies Plaintiff's claims.**

**Defendant Greg Weiss – Palm Beach County Canvassing Board Member**, is tasked with ensuring the security, accuracy, and transparency of election results per Florida Statutes §102.141, verifying vote tallies and safeguarding election data integrity.

**Defendant David Kerner – Director of FLHSMV**, oversees the verification of voter registration data under Florida Statutes §§ 97.057 and 97.052, ensuring secure transmission of data to maintain an accurate voter database.

## LEGAL ARGUMENT

**Case Law on Rule 59(e) and Rule 60(b) Flexibility**

1.    In *Gonzalez v. Crosby*, 545 U.S. 524 (2005), the Supreme Court underscored that Rule 60(b)(6) applies in "extraordinary circumstances" where newly discovered evidence or exceptional circumstances arise beyond the 28-day window, justifying equitable reconsideration.

2.    Similarly, *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) held that Rule 60(b)(6) may override strict procedural limitations where justice requires, acknowledging that rigid deadlines may be waived in the interest of preventing manifest injustice.

**Relevance and Impact on Plaintiff's Claims**

3.    The new evidence substantiates Plaintiff's claim that Defendants failed in their duty to administer a secure, honest, accountable, and fair election. Without emergency intervention, the election remains compromised, further damaging Plaintiff's rights as a candidate and the broader electoral process.

**Immediate and Irreparable Harm**

4.    The election outcome resulting from numerous cases of fraudulent vote-by-mail ballots issued and voted, discernible negligence by election officials, mail ballot theft, DS-DE 40

form modifications, repeated outages by VR Systems on targeted days, and foreign actors targeting down ballots, materially impacts Plaintiff's election results. Irreparable harm is imminent absent emergency relief.

### RELIEF REQUESTED

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1. **Reconsider its order granting Defendants' Motion to Dismiss** under Rule 59(e) or Rule 60(b), based on newly discovered evidence indicating fraudulent requests, issuance and voted vote-by-mail ballots, irregular rule changes, additional evidence of fraud and maladministration election official misconduct, and mail ballot theft.

2. **Request for Invalidation of Illegally Requested Vote-by-Mail Ballots**: Due to the substantial number of vote-by-mail ballots that were requested and issued, and the complete breakdown of vote-by-mail ballot internal controls, in violation of Florida Statutes, Plaintiff respectfully requests that this Court invalidate all such ballots that were not issued in compliance with the applicable statutory provisions, including those that failed to meet the mandatory voter verification requirements under §101.62(1)(b). These unlawfully issued ballots represent a significant portion of the total votes cast and materially affected the election outcome.

Legal Precedent for Investigation and Remedy: In similar election contests such as *In re the Matter of the Protest of Election Returns and Absentee Ballots in the November 4, 1997 Election for the City of Miami*, 707 So. 2d 1170 (Fla. Dist. Ct. App. 1998), expert independent evidence and testimony led the trial court to conclude that absentee ballot fraud led to the integrity of the election being adversely affected. The court invalidated the absentee ballot votes. The court also noted, "that unlike the right to vote, which is assured every citizen by the United States Constitution, the ability to vote by absentee ballot is a privilege. In fact, the Florida

Legislature created this privilege by enacting statutory provisions separate from those applicable to voting at the polls." In *Wilson v. Revels*, 61 So.2d 491 (Fla. 1952)." Id. at 567, the Supreme Court of Florida went on to expressly approve the trial court's remedy, which was to invalidate all of the absentee ballots. *Spradley v. Bailey*, 292 So.2d 27 (Fla. 1st DCA 1974); *Bolden v. Potter*, 452 So.2d 564 (Fla. 1984), expressly rejecting the contention that invalidating all absentee ballots, in the face of extensive absentee vote buying, was an unjustified disenfranchisement of those voters who cast legal ballots). Vote-by-mail ballots are also a privilege granted by the Florida Legislature and invalidating them upholds the precedent that ensures voters who lawfully cast their ballots are not disenfranchised.

5. **Reconsideration of the Motion to Dismiss**:

   Plaintiff requests that the Court reconsider its prior order granting the motion to dismiss, allowing Plaintiff a period of **FOUR days to file a Third Amended Complaint** to address any deficiencies and provide further substantiation for the claims presented.

6. Plaintiff's third amended complaint to contain ONE COUNT of Common Law Negligence causing deprivation of rights.

7. **Further Relief**: Grant any additional relief the Court deems just and necessary to protect the election's integrity and restore public confidence.

**Respectfully submitted on November 14tth, 2024**

Jeff Buongiorno
1901 South Congress Ave. No 220
Boynton Beach, FL 33429
jeff@etektraining.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed with the Court's

CM/ECF System, which provides notice to all parties on this 14th Day of November 2024.


Jeff Buongiorno

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: 24-80920-CIV-Cannon

---

JEFF BUONGIORNO,
*Plaintiff,*
v.
ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States
Department of Homeland Security, et al.,
*Defendants.*

---

**ORDER GRANTING PLAINTIFF'S REQUEST FOR DECLARATORY AND**

**INJUNCTIVE RELIEF TO INVALIDATE VOTE-BY-MAIL BALLOTS IN PALM**

**BEACH COUNTY FOR THE 2024 GENERAL ELECTION**

THIS MATTER is before the Court on Plaintiff Jeff Buongiorno's Motion for Declaratory and

Injunctive Relief to Invalidate Vote-by-Mail Ballots in Palm Beach County for the 2024 General

Election. The Court, having reviewed the Motion, supporting evidence, applicable law, and

being otherwise fully advised in the premises, finds as follows:

**Chapter 1 FINDINGS OF FACT**

1. Plaintiff has provided evidence of **discrepancies and irregularities** in the vote-by-mail
   ballots cast in the 2024 General Election in Palm Beach County, which demonstrate
   compromised data integrity and significant deviations from in-person voting trends.

2. Over a period of **14 days of in-person voting**, 491,191 verified voters cast ballots with
   photo ID verification, resulting in a **3.07% margin of victory for Plaintiff Buongiorno**
   over Defendant Link.

3. By contrast, the **vote-by-mail category** showed significant discrepancies with 228,353 ballots cast, yielding a **48.3% margin in favor of Defendant Link**, which is inconsistent with the verified in-person voting trends and raises concerns about the authenticity and security of these ballots.

4. Evidence indicates **data security issues and procedural failures** in the vote-by-mail process, including:

   o Documented alterations in official records and failures in identity verification controls.

   o The October 15, 2024, theft of mail bags containing ballots from the Boynton Beach Post Office, further casting doubt on the chain of custody and integrity of these ballots.

5. Under **Norman v. Ambler, 46 So. 2d 415 (Fla. 1950), Browning v. Florida Democratic Party, 2010 WL 11508510 (Fla. 1st DCA),** and **In Re: Matter of Absentee Ballots for the General Election, 34 So. 3d 694 (Fla. 2d DCA 2010),** absentee voting in Florida is a statutory privilege subject to regulation by the state legislature. Courts have authority to restrict or exclude vote-by-mail ballots where data integrity and reliability are compromised.

**Chapter 2 CONCLUSIONS OF LAW**

The Court concludes that the vote-by-mail process in Palm Beach County, as conducted in the 2024 General Election, demonstrates a failure to meet minimum standards of data security and integrity, as required under Florida law. Due to the documented irregularities and lack of

sufficient procedural controls, the Court finds that vote-by-mail ballots in Palm Beach County cannot be certified as authentic.

**Chapter 3 ORDER**

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. **Invalidation of Vote-by-Mail Ballots**: All vote-by-mail ballots cast in Palm Beach County for the 2024 General Election are hereby declared **invalid** and shall be excluded from the certified election results for this election.

2. **Alternative Relief – Halt Certification and Conduct Comprehensive Audit**: In the event of an appeal or further review:

   o  Certification of vote-by-mail results shall be stayed pending a **comprehensive audit**.

   o  Palm Beach County shall provide access to all relevant data, including **originating IP addresses of online vote-by-mail requests, audit logs, machine logs, configuration reports**, and all tabulator reports including but not limited to EL 30A, EL 45A, EL 52A, and EL 68A.

   o  The audit shall be conducted by a qualified third-party auditor and may include the Plaintiff's designated audit team.

3. **Additional Relief**: The Court reserves the right to order any further relief deemed just and necessary to protect the election's integrity and restore public confidence.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this ___ day of _____, 2024.

_____

**Judge Aileen M. Cannon**
**United States District Judge**